ALDINE TRUST COMPANY et al., Appellants, v. NATIONAL BENEFIT ACCIDENT ASSOCIATION, Appellee.

No. 43232.

JULY 31, 1936.

Brammer, Brody, Charlton & Parker, for appellants.

Parrish, Cohen, Guthrie & Watters, for appellee.

PARSONS, C. J.—The plaintiffs are executors of the estate of Ross Hall Skillern, deceased. In his lifetime Skillern took out two policies of accident insurance with the defendant company, each in the sum of five thousand dollars, one of which policies was issued July 2, 1930, being No. BP 100921, and the other being No. BP 100955, issued July 14, 1930, and each making the estate of the insured the beneficiary. The insuring clause in each policy was as follows:

"DOES HEREBY INSURE Ross Hall Skillern (hereinafter called the Insured) under classification A, by occupation Physician against loss or disability as herein defined, resulting solely from bodily injury (independently and exclusively of disease, whether disease pre-exists or be thereafter contracted) and effected solely through external, violent and accidental means", etc.

The insured died September 20, 1930. Proofs of death were filed within proper time, and suit was brought on each policy June 24, 1931. The petition was in two counts, each count containing the date of death and the injuries from which death resulted as sustained on steamship Baltic enroute from Liverpool to New York, September 11, 1930; that the injuries were fracture of the third, fourth, fifth and sixth ribs in the mid-axillary line on the left side, causing intracranial fat embolus, or blood clot, from which death resulted.

The answer to the petition was a general denial, but defendant admitted the issuance of the policies as set out in the petition, and pleaded further:

"For further answer the defendant denies that the death of the insured resulted solely from bodily injuries effected through external, violent and accidental means and alleges the fact to be that the said Ross Hall Skillern did not die as a result of an accident."

And defendant admitted that due proof of loss was furnished within the time required by the terms of the policies.

So under the issues in this case it is not only incumbent on plaintiff to show that the decedent met with an accident fracturing several ribs, claimed to have been fractured, but in addition to show that subsequently death took place and was caused by an intra-cranial fat embolus, or blood clot, which resulted

from the accident, for under the policy or contract of insurance it must have resulted solely from bodily injury (independently and exclusively of disease, whether disease pre-exists or be thereafter contracted) and effected solely through external, violent and accidental means.''

Ross Hall Skillern, the injured, was a physician about 54 years of age, practicing in Philadelphia, Pa., and he took out the policies a short time before he and his wife, one of the plaintiffs herein, started on a trip to Europe in 1930, and from which they started to return September 6, 1930. While on the return trip on the steamer ''Baltic'' the doctor and his wife took breakfast together September 11th, and left the dining room about ten a. m., he going toward the deck and she to their stateroom, where she remained about a half hour, then she went to the deck, but noticing it was slippery, she went to the salon and read. She did not see the doctor until about twelve o'clock noon, or about two hours after leaving him. She found him lying on the bed, on his back, with pillows under his left side, with his coat off, and looking very white, and his face showed suffering; the whiteness continuing for some time. During the remainder of the voyage Dr. Skillern took no exercise, but spent his time in the stateroom or in his deck chair. Following September 11th he used more pillows on his bed, and they were placed under his left side. During that time he would groan every time he moved. He would frequently complain of pains when dressing, or when raising his left arm, and said the pain was in his left side. So far as Mrs. Skillern knew, previous to that morning, the doctor did not have pain in his left side, and when she left him that morning of September 11th his color was natural, not white or pale.

During the taking of testimony the following took place:

''Q. When you first saw Dr. Skillern in his stateroom about 12 o'clock, or noon of September 11, 1930, what, if anything, did he say to you?

''Mr. Guthrie: Objected to as incompetent, irrelevant and immaterial, and not part of the res gestae, calling for hearsay testimony.

''Mr. Brammer: We are offering this testimony as a part of the res gestae.

''The Court: I am going to sustain the objection at this time. (Plaintiffs except.)

"Mr. Brammer: Plaintiffs at this time offer to prove by the witness Eliza P. Skillern, if permitted to do so, that about 12 o'clock on September 11, 1930, Mrs. Skillern saw her husband in his stateroom aboard the steamship Baltic; that as soon as she saw him at that time he said to her, 'I slipped and fell on the deck and have a terrible pain in my left side.'

"Mr. Guthrie: To which offer the defendant makes all the objections heretofore made when the question was propounded, and which was ruled upon by the court for the reason that the same is incompetent, irrelevant and immaterial, and for the further reason that it is not a part of the res gestae, nor does it tend to prove the res gestae, nor is it competent as a part of the res gestae.

"The Court: The objection will be sustained at this time. (Plaintiffs except.)"

We have had something to say heretofore in reference to the rule of res gestae in Califore v. Ry. Co., 220 Iowa 676, 263 N. W. 29. Califore, the plaintiff's decedent, made declarations shortly after his injury, and they were held admissible as substantial evidence as a part of the res gestae. In Stukas v. Warfield-Pratt-Howell Co., 188 Iowa 878, 888, 175 N. W. 81, 84, one Stukas was injured in an elevator, and suit was brought by his administrator for death resulting from the injury. When the deceased was found his eyes were bulged out of his head and real bloodshot, and he was unconscious. He was taken to the hospital, where he said of the operator of the elevator, the "son of a bitch" would not stop the elevator when he hollered. Others heard him. On his wife's arrival at the hospital he said to her that he got his foot caught in the elevator and the elevator man would not stop, but went right on. In the Stukas case the court said:

"We have repeatedly said that the proper test of admissibility of such statements 'is whether they relate to the principal transaction and are explanatory of it and are made under such circumstances of excitement still continuing as to show they are spontaneous and not the result of deliberation or design. * * * Within this general rule the admissibility of the declaration under the circumstances of the particular case is largely within the discretion of the trial judge. The facts and circumstances

of no two cases can be precisely alike and the exact length of time is not mathematically controlling.' "

Hinnah v. Seaba, 193 Iowa 1206, 188 N. W. 909, lays down the rule that statements relative to what took place at an encounter, even tho made in response to nonleading questions, are admissible as part of the *res gestae,* when made at a time and place and under such circumstances as to preclude the idea of sinister motive, when they are such as to afford a reasonable or reliable explanation of the encounter. In this case something like an hour elapsed between the occurrence and the statements in question.

Vernon v. Iowa State Trav. Men's Assn., 158 Iowa 597, 600, 138 N. W. 696, 698, where the plaintiff brought suit on a certificate of accident insurance, she was permitted over defendant's objection to prove that while she and her husband were at the sanitarium the husband went to take a bath, and upon his return he exhibited to her one of his limbs which bore an abrasion of the skin. He exclaimed to his wife, "I want to show you how rough that damn fool was with me in the bathroom." The court said this was properly *res gestae* of the transaction, and there was no error in overruling defendant's objection.

Rothrock v. Cedar Rapids, 128 Iowa 252, 254, 103 N. W. 475, 476, says that the declarations of one injured as the result of a fall on a defective sidewalk, as to the manner of the fall and the place at which the injury was sustained, which were made within thirty minutes after its occurrence and while suffering therefrom, are admissible as *res gestae.* The statements were offered in a deposition of a daughter, but the answers of the deposition as relating to the declarations, were stricken out on defendant's motion, and the daughter was not allowed to testify thereto. The plaintiff made an offer to prove the deceased made declarations, which was overruled. The court said:

"In our opinion, the declarations of a deceased, made within a half hour after she received the injury from which she was suffering at the time the declarations were made, might be proven, as a part of the *res gestae* of the injury from which deceased was suffering, as explanatory of her then condition, and connecting such condition with the injury which had caused it. The declarations were made so soon after and under such circumstances that they clearly appeared to be spontaneous and

unpremeditated. While it is difficult to state any precise rule in accordance with which the admissibility of such declarations can be definitely determined for all cases, our conclusion in this case is amply supported by the following authorities: Keyes v. Cedar Falls, 107 Iowa 509, 78 N. W. 227; Travelers Ins. Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437; Murray v. Boston & M. R. Co., 72 N. H. 32, 54 Atl. 289, 61 L. R. A. 495, 497, 101 Am. St. Rep. 660; Augusta Factory v. Barnes, 72 Ga. 217, 53 Am. Rep. 838; Lewis v. State, 29 Tex. App. 201, 15 S. W. 642, 25 Am. St. Rep. 720.''

■■■ We think under the circumstances of this case, where less than two hours before Dr. Skillern and wife had separated at the dining room, he going toward the deck, and she, in about a half hour afterwards, going on to the deck and finding it slippery went to the salon to read. When later she went to her stateroom she found her husband in the condition described, and the statements made to her at that time are admissible, as a part of the explanation why he was suffering pain, at least, and as a spontaneous statement explanatory of his condition and what led to it. And that as such it should have been admitted, and for these reasons the court in excluding the statement committed error.

Miss Lusch, secretary to Dr. Skillern, testified that when he came back from Europe he came to the office on the 16th but attended mostly to correspondence; that on the 17th he saw a few patients, as on the 18th, 19th and 20th. That he complained of pain in his side when she helped him on with his office coat, and she observed the change in his manner when he changed from his street coat to his office coat; when she helped him on with his coat and as he put his hand in his sleeve he would groan. She observed this every day after his return from Europe until Saturday, the 20th. That on the 20th he came in from Dr. Talley's office, about forty feet from his own, and reclined on his couch. She at that time observed no impediment in his speech or mental confusion, or weakness of extremities, but he moved about going from one room to another, and she did not notice anything unusual or abnormal in his appearance. That as he reclined on his couch he appeared to be in pain, and she remained with him in his room until Dr. Talley came in. Then she stepped into the hall. Later she entered Dr. Skillern's

room and he reminded her that he had an appointment at Bahls restaurant with a man coming from Washington and he asked her to go over and get the man, and that when she brought him over he would be able to drive home. She conversed with the doctor at that time about 1:10, and observed nothing unusual in his eyes or facial expression. He appeared to be in pain at the time. She returned from the errand about 1:25 and Dr. Skillern was still on the couch, but unconscious. She called Dr. Talley and returned to the room, and Dr. Skillern died at about 1:30 p. m., September 20, 1930.

Dr. Bates, a physician from Philadelphia, saw Dr. Skillern at his office on September 17th. Skillern had sent for the doctor to examine him, because of pain in his chest. He complained of pain over the front of chest, back and side. Dr. Bates found extensive tenderness in the area in which he described his pain, posterially, laterally, and the front of the upper left chest. This tenderness became pain on deep inspiration, and cough, which he did at the doctor's request. The doctor suspected a fractured rib and made arrangements for X-ray examination with Dr. B. P. Widmann. Dr. Widmann took two X-ray pictures, exhibits 5 and 6. Dr. Bates again saw Dr. Skillern on the 18th, and found that as a result of the application of heat he felt a little more comfortable, but still suffered pain in the chest. In the absence of X-ray evidence of fracture the doctor concluded that the pain was due to a contusion, and advised the continuation of heat and rest. Following the receipt of exhibit 5 from Dr. Widmann, Dr. Bates assumed there were no fractured ribs and his advice for treatment was based on that assumption. After Dr. Skillern's death Dr. Bates examined the X-ray pictures again; one he had seen before. They were taken at different angles. The one picture he had seen before showed no evidence of fracture. This picture was taken from position known as A-P. The second picture showed distinct evidence of complete fractures of the third, fourth, fifth and sixth ribs in good alignment, in the mid-axillary line on the left side. He was present when the post-mortem examination took place.

Dr. Widmann who took the two X-ray pictures informed Dr. Bates that he was unable to find any evidence of fracture, that only one of the two films made was satisfactory for diagnosis. Dr. Skillern did not see the films, and no report was made to him. He, Dr. Widmann, admits giving a letter to Dr. Bates

in which he said there was no demonstration of fracture in the films.

An autopsy was performed on the body, which disclosed the fracture of the third, fourth, fifth and sixth ribs on the left side in the mid-axillary line.

Whatever may have been the imperfections in the two films taken, which did not result in the disclosure of the fracture prior to the death of Dr. Skillern, the autopsy did disclose that, and a re-examination of the films disclosed the fracture.

The plaintiff then put in the testimony of experts based upon a hypothetical question, and there was testimony by them that was intended, if taken as true, to show that the death of Dr. Skillern was caused by an intra-cranial embolus. True, it was not as strong as it might have been, but the experts so testified. At the conclusion of all the testimony the defendant moved the court for a directed verdict. The motion was overruled, and the defendant then put in its evidence, which evidence was a number of experts called by the defense to meet the testimony of the experts called by the plaintiffs. And they seemed to meet it, because the two sets of experts differed on about every question put to them. The difference was so great that if it is a fair sample of conclusiveness of the finding of physicians, it is difficult to find out what the exact truth is. At the close of all the testimony the defendant again moved for a directed verdict, and motion was overruled. Thereupon the court instructed the jury, and the jury after retiring and considering the case, brought in a verdict for the defendant. Exceptions were taken and properly preserved by the court. Motions for new trial were made, and they were all overruled.

As we view the record, and as the lower court viewed it, evidently there were questions in the case for the jury, and about the only other question we care to discuss is as to the exceptions to the instructions and the error assigned thereon.

■■ The appellant excepts to the 16th instruction given by the court. That instruction was as follows:

"No mere weight of evidence is sufficient to establish the cause of the assured's death unless it excludes every other reasonable hypothesis as to the cause of death, and as a great amount of the testimony is based upon the opinion of experts, you should consider and determine that all causes of death

other than a fat embolus or blood clot have been excluded from your findings.''

Amongst the objections registered to the instruction was,

''The instruction is erroneous, confusing, misleading and prejudicial, in that:

''(a)   It places upon the plaintiffs the burden of proving their case beyond a reasonable doubt, whereas the law requires only that their case be established by a preponderance of the evidence.''

Another objection was that it places upon plaintiffs an unfair, unjust and unlawful burden, in that they are required to establish the alleged cause of death by proof of a different and substantially higher degree than that prescribed by law. And again, that the last half of the instruction is unintelligible, misleading, confusing and inherently prejudicial, which reads:

''and as a great amount of the testimony is based upon the opinions of experts, you should consider and determine that all causes of death other than a fat embolus or blood clot have been excluded from your findings.''

If the first half of the instruction is correct, in our view the last half is neither unintelligible, misleading, confusing nor inherently prejudicial. For the court meant only that to find for the plaintiff it must be that death resulted from an embolus.

We will consider first the question whether or not the burden of proof of the case is properly laid down in the first half of the instruction. This instruction, it is true, follows the language of the court in Asbach v. C. B. & Q. Ry. Co., 74 Iowa 248, 37 N. W. 182, in which the court says:

''The main question in the case is whether the judgment is supported by the evidence. It is undisputed that the animal in question was killed while running at large by falling from a bridge on defendant's railroad, and that the track at that point was not fenced. None of the witnesses claim to have seen the accident, and the exact time when it occurred cannot be determined from the testimony. The engineers who were employed on that part of the road were examined, and each testified in effect that the animal was not struck or thrown from the bridge by his engine, and that he did not, at any time near the date

when it was found dead beside the bridge, see it upon the track or bridge. It was also proven that all the trains at that time passed the point in question by daylight. Plaintiff claims, however, to have established certain circumstances which lead reasonably to the conclusion, as she claims, that the animal, being frightened by an approaching train, ran upon the bridge until it fell upon the ties, and, in struggling to arise, it fell to the ground below, and was killed. Unless this theory as to the cause of the injury can be maintained, the judgment cannot be upheld, for there is not only no evidence that the animal was struck and thrown from the bridge by a passing train, but there is positive evidence to the contrary, and no effort was made to impair the credit of the witnesses who gave that testimony; and when we look into the testimony relied upon to establish the theory, we think it utterly fails to establish it. The circumstances relied upon are that the animal was exceedingly nervous, and was always liable to be frightened by a moving train or locomotive, and that it was with great difficulty that it could ever be driven upon or about a railroad track; that a train was stopped near the bridge on the evening of the first of August, that being two or three days before plaintiff learned of the injury; and that a witness who, on a day near that date, passed near the bridge at three o'clock p. m., and again at a later hour, saw the horse lying dead by the bridge on his return, but did not see it when he passed the first time. The evidence of the stopping of the train is exceedingly unsatisfactory, none of the witnesses having seen it stop. They were all more than a mile from the bridge at the time, and they judged that it stopped from the noise that they heard; but, if it should be conceded that it did stop at the time alleged, there is absolutely no connection between that circumstance and the death of the animal, or, at least, none is shown. The witness who first saw it after the injury did not pretend to fix the date when he saw it. The fact that he saw it at that hour in the day is of no materiality at all, unless the circumstance happened on the evening on which the train was stopped; and whether it did happen on that evening is a matter of mere conjecture. A theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such a nature and are so related to each other, that it is the only conclusion that can fairly or reasonably be drawn from them. It is not sufficient

that they be consistent, merely, with that theory, for that may be true, and yet they may have no tendency to prove the theory. This is the well-settled rule, and it is manifest that under it plaintiff's theory is not established. The facts relied upon to prove it are quite as consistent with the theory that the animal went upon the bridge of his own volition, or that he was frightened by something else than a train, and ran upon it, as with it.''

The language of this court in the cited case has been approved not only by numerous decisions of this court, but by numerous decisions of the courts in other states. A long list of these authorities is cited by the appellee in its brief, 22 of which are from the supreme court of Iowa. But in the view that we take of this case, the Asbach case is not controlling. In that case there was nothing but circumstantial evidence. In this case, as we view it, there is evidence which is not circumstantial, from which the jury might find the fact that Dr. Skillern was injured by some external violence, and that that injury took place about the time claimed by the plaintiff, on September 11, 1930. That as a matter of fact, the ribs of the doctor were cracked or broken; an X-ray disclosed this prior to the death of Dr. Skillern; that the autopsy disclosed that the ribs were fractured, and that this must necessarily have been by violent, external means. So there was some evidence here outside the evidence of the physicians, that Dr. Skillern received an injury at sometime which resulted in the ribs being in the condition they were in. So, without in any way questioning the Asbach case, and the cases following it, we necessarily come to the conclusion that the instruction as given placed upon the plaintiff an undue burden of proof in the first half thereof. There is evidence from which the jury could find that Dr. Skillern received by violent, external and accidental means a fracture of the ribs. This outside of the expert opinion evidence. With that added, to find that the death was the result of the accident and was caused by a fatty embolus or blood clot. In other words, it made a jury question which the jury had a right to decide under proper instructions, and without plaintiffs being required to prove their case beyond a reasonable doubt.

What is the evidence, outside of the facts which we think the jury was warranted to find, that Dr. Skillern received by violent, external and accidental means a fracture of the ribs,

that would warrant the jury in finding that the death was the result of the accident, and resulted from a fatty embolus, or blood clot? It is to be found in the testimony of the experts. We think on the whole case that this testimony permitted plaintiffs to go to the jury. In other words, it made a jury question which the jury had the right to decide under proper instructions, and without plaintiffs being required to prove their case beyond a reasonable doubt to exclude every other possible theory of death than the one claimed.

A very good statement of the law as applied to expert testimony is found in Vol. 3, Sec. 258, of Ford on Evidence, a recent publication. We here set out the section:

"There are two classes of cases in which expert testimony is admissible. To the one class belong those cases in which the conclusions to be drawn by the jury depend upon the existence of facts which are not of common knowledge but which are peculiarly within the knowledge of men, who, by experience and study, are enabled to accurately observe them. If, in such cases, the jury, with all the facts before them, can form a conclusion thereon, it is their sole province to do so, and the expert will not be permitted to assume their function by giving his conclusion or opinion based upon them.

"On the other hand, there are cases in which conclusions to be drawn from the facts stated or observed by the expert or testified to by others, depend upon knowledge or skill, not within the range of ordinary training and intelligence. In such cases, not only the facts but the conclusions to which they lead, may be testified to by qualified experts, and it makes no difference whether the jury must pass upon them or not, providing the necessity for receiving the opinion exists.

"But opinions are admissible only when, from the nature of the case, the facts cannot be stated or described to the jury in such a manner as to enable them to form an accurate judgment thereon and no better evidence than such opinions is obtainable. When the jury can form proper conclusions, after facts known only to the experts have been disclosed, it is the jury's province to draw the conclusions."

It will be observed that within this rule it says that "in such cases not only the facts but the conclusions to which they lead may be testified to by qualified experts, and it makes no

difference whether the jury must pass upon them or not, providing the necessity for receiving the opinion exists.''

Facts such as were in issue in regard to the cause of the death of Dr. Skillern, cannot in the nature of things be stated or described to the jury in such a manner as to enable the jury to form an accurate judgment thereon. And no better evidence than such opinion is obtainable. This seems to us to be a logical statement of the reasons for the using of the testimony of experts, as the testimony was used in this case.

The plaintiff called to the witness stand four physicians as experts, and propounded to each a hypothetical question, covering 117 lines in the printed abstract, which purports to be and is a very good summary of the testimony in the case. The same question was asked each witness, and at the end of the hypothetical question each witness was asked,

''Assuming the facts set forth in the hypothetical question to be true, in your opinion might Dr. Skillern's death have been caused by an intra-cranial embolus?''

In each case this was followed by a second question:

''Assuming the facts set forth in my hypothetical question to be true, what in your opinion was the probable cause of Dr. Skillern's death?''

The first medical expert called by the plaintiff was Dr. Hugh M. Miller. In answering the first question following the hypothetical question he said, ''Yes'', and to the second question he answered, ''traumatic fracture of the ribs with delayed or secondary cerebral embolus.''

The second physician called, Dr. Piersol, answered the first question, ''It might have been'', and the second question, ''By exclusion, an intra-cranial embolus.''

The third physician called, Dr. Losh, answered the first question, ''It could be caused by intra-cranial embolus'', and to the second question he answered, ''Cerebral embolus.''

Dr. Wolcott, the fourth physician called on direct, answered the first question, ''I think so'', and the second question, ''I think he died from cerebral embolism.''

The defendant on its part called four physicians as such experts. The first one answered the first question following the hypothetical question, ''No, sir'', and said, ''There were no

symptoms of cerebral hemorrhage.'' The next physician testified to the first question that the symptoms indicated cerebral hemorrhage as the cause of death. The last physician called on this answered the first interrogatory, ''No, sir'', and said, ''In my mind the symptoms indicate a stroke of apoplexy or cerebral hemorrhage. To determine whether or not there was an embolus in the brain it would be necessary to have a post-mortem examination of the brain. The only thing that is lacking in this case for cerebral hemorrhage is paralysis. The fracture of four ribs could be caused only by the application of some external force or violence.''

So we have in this case experts called to testify as to the cause of death. Half of said experts said one thing, and the other half said another. Their testimony was contradictory one of the other. It makes us sometimes wonder whether or not, with such exhibitions as this, as to whether any reliance whatever can be placed upon expert testimony along these lines. But the law permits it. The law requires it. These men have spent years in the study of these things. To submit all the symptoms in this case to a jury composed of laymen, not learned in the technicalities of medicine or surgery, in the intricacies of the human system, would to a large extent, be like throwing pearls before swine. Juries would not know what to do with such facts, uninterpreted by persons whose education and training entitle them to speak of such facts. Here is conflict in this case as to the main question,—what caused the death of Dr. Skillern? If tried to a jury, the jury must decide. If tried to the court without the intervention of the jury, the court must decide. Where there is a disputed question of fact necessary to be determined, in the case, the judgment of the jury on the matter is final and conclusive if properly submitted.

■■ What we have said about expert testimony applies largely to other testimony in the courts. Frequently witnesses who claimed to be eye witnesses to ordinary happenings in life, all apparently clear and honest, and who desire only to do the right thing, yet give different versions of the matter. The facts in this case present no more puzzling question than the facts in the ordinary case that comes before the court. The jury must decide. The court must instruct and lay down the rules by which the jury is to determine the case, and view the evidence, and presumably the jury follows these rules. And where the

34

rules are laid down wrongly, although the jury may possibly arrive at the same result if left to it without instructions, yet where the court instructs and lays down the wrong rule, it must be conclusively presumed the jury followed the rule laid down by the court. So we think in this case that on account of instruction 16, and on account of the exclusion of the testimony of Mrs. Skillern as to the conversation with her husband when she came back to the stateroom, this case must be and is hereby reversed and remanded for new trial.

KINTZINGER, DONEGAN, ALBERT, STIGER, and RICHARDS, JJ., concur.