SIGRID E. WATTERS, appellee, v. IOWA STATE TRAVELING MEN's ASSOCIATION, appellant.

No. 48616.

(Reported in 69 N.W.2d 1)

MARCH 8, 1955.

Dickinson, Throckmorton, Keir, Parker & Mannheimer, of Des Moines, for appellant.

Parrish, Guthrie, Colflesh & O'Brien, of Des Moines, for appellee.

BLISS, J.—The petition alleged: that defendant, an assessment accident insurance association, incorporated under the laws of Iowa, entered into an insurance contract with her husband, Phil Ganz Watters, on February 5, 1946, as evidenced by its certificate of membership, insuring said member against death resulting from accidental bodily injuries, independently and exclusively of all other causes, in the sum of $5000, which contract was in effect from its execution up to and at insured's death; that on November 25, 1952, insured accidentally fell at his house in Des Moines, "sustaining therefrom an injury to his left chest, contusions in the area of the seventh and eighth ribs and fracturing the eighth rib on the left side, which accidental injury resulted in insured's hospitalization and his death on December 12, 1952, said death resulting from accidental bodily injuries independently and exclusively of all other causes and within 90 days from the date of the said accident"; that on February 5, 1953, plaintiff filed claim and proof of loss with defendant, which was disallowed and payment refused on May 6, 1953; and that because of the matters alleged, defendant is indebted to the plaintiff in the sum of $5000 with legal interest from May 6, 1953, for which amount with costs judgment was prayed.

The answer of defendant, in Division I, admitted all allegations of the petition excepting those claiming death resulting from an accidental fall, independent and exclusive of other causes, and that defendant was indebted to plaintiff in any amount. In Division II of its answer, defendant, after setting out Article II of its by-laws, to wit: "Benefits. Section 1. Subject to the conditions, limitations, and exceptions contained herein, and in Articles III, IV and V of the by-laws of this Association: Whenever a member of this Association shall through accidental means receive bodily injuries which shall independently and exclusively of all other causes, result within 90 days, in the death of the member, his beneficiary shall, in lieu of weekly indemnity in these by-laws provided, be indemnified in the sum of, (1) $5000 in case of a Class A Member under 70 years of age at the time of the injury * * *", alleged for further answer to plaintiff's petition and cause of action and as a com-

plete and separate defense thereto, that for a number of years prior to his death the insured had been suffering from heart disease aggravated by arteriosclerosis, and under a doctor's treatment therefor, and that he "did not receive bodily injuries which independently and exclusively of all other causes resulted in his death but that his death was caused by heart disease aggravated by arteriosclerosis as above alleged."

In Division III of its answer, defendant stated: "For further answer and as a complete defense to plaintiff's petition and cause of action, and in the event the defenses in Divisions I and II of this answer are not sustained, this defendant pleads in the alternative that it is provided by the by-laws of defendant in the 'Conditions, Limitations and Exceptions' in Article II as follows: 'H. This Association shall not be liable in excess of one tenth of the amounts in these by-laws provided for death * * * arising from * * * or effected by * * * heart disease * * *' and this defendant alleges that insured was on December 12, 1952, and had been for more than two years prior, suffering from heart disease aggravated by arteriosclerosis and under a doctor's treatment therefor, * * * and that the death of insured arose from or was effected by said heart disease within the meaning of Paragraph H hereinbefore quoted and that, therefore, plaintiff is not entitled to recover in excess of ten per cent of the maximum benefits otherwise payable under the certificate of membership, to wit: $500."

Plaintiff's reply admitted the sections of the by-laws of defendant quoted in its answer, but denied all allegations adverse to her.

Defendant's motion to direct a verdict for it at the close of plaintiff's case and a like motion at the close of all the testimony were denied. The cause was submitted to a jury which returned a verdict in favor of plaintiff for $5000. Defendant's motion for judgment notwithstanding the verdict, and in the alternative for a new trial, was overruled in its entirety.

As shown by the pleadings the issues are: Was the insured's death caused by an accidental fall independent and exclusive of any other cause, as contended by plaintiff? Or was death caused by heart disease aggravated by arteriosclerosis, as alleged in

Division II of defendant's answer, or was defendant in no event liable in excess of $500 for the insured's death "arising from * * * or effected by * * * heart disease * * *" by virtue of Paragraph H of the certificate of membership, as alleged in Division III of defendant's answer?

Notwithstanding the simplicity of the issues, a printed record of 320 pages, defendant's arguments of 170 pages, and plaintiff's argument of 114 pages are presented to the court.

The parties have no controversy over the applicable law. Defendant states in its printed argument: "In this connection, we call to the court's attention, parenthetically, that counsel for both sides by formulation of the issues as expressed in the pleadings and by the testimony elicited from the witnesses, demonstrated beyond all question that there is no difference of opinion between the parties with respect to the law applicable to the case."

The following factual matters have substantial support in the record. Dr. Phil Ganz Watters was a prominent physician and surgeon who practiced his profession in the city of Des Moines for many years. He was associated with his brother in the practice. When his son began the practice of dentistry, his office was in the same suite as the office of his father. Part of his practice was outside of his office, and at the Homesteaders Life Insurance Company. His vacations were few, usually a few days or week ends in the summer at Clear Lake, Iowa.

On December 23, 1950, he was admitted as a patient to the Iowa Lutheran Hospital at Des Moines. Dr. George E. Mountain attended him professionally for the first time, on this occasion. He testified that the patient gave a history of being extremely short of breath and very tired, and was suffering from a serious heart ailment, which he diagnosed as a fairly typical case of congestive heart failure. His blood pressure while in the hospital at times was 200 systolic and zero diastolic. He was treated with digitalis, a heart tonic, and was dismissed on January 6, 1951, as improved. The next day, January 7, Doctor Watters was readmitted to the hospital. Doctor Mountain testified that on this second admission, the patient was nauseated, dizzy and dehydrated, or lacking in body fluids. He was suffering from an

excess of digitalis which he had taken in the hospital to overcome his cardiac weakness. He was afflicted with what was diagnosed as "digitalis intoxication." The giving of digitalis was ended, plenty of fluids were substituted and the situation corrected itself. He was dismissed again on January 11, 1951, and when he left the hospital he was improved over his admitting symptoms.

While Doctor Watters was in the hospital in December 1950 to January 1951, his liver, according to Doctor Mountain, was somewhat enlarged—about two fingers below the diaphragm. His heart was also enlarged and occupied about 66% of the chest cavity, instead of 50% which would be normal. There was some albumen in the urine, which did not necessarily indicate kidney trouble. As stated by Doctor Mountain: "Albumen, in Doctor Watters' case, I interpret as being a congestion of the kidneys, the same as a congestion of the liver or a congestion of the legs, therefore interfering with the normal functions of the kidneys, so we had an indirect interpretation on that rather than a true kidney disease itself. * * * In this case I interpret the poor functioning to be due to congestion rather than to infection or nephritis, or something of that kind. I thought the congestion was due to heart disease in this case because it was consistent with swollen ankles, etc. * * * There is no cure for this condition, but simply relief. There is no correction of the problem basically as to the heart valve which was a crux of the problem, one of them * * *. He could be compensated and go along pretty well by adjusting his program. I attended Doctor Watters from January of 1950 until the time of his death, December 12, 1952. During that time he came to my office from time to time, and we would check him over. I would say five, six or seven times." Examining an electrocardiogram of Doctor Watters, taken December 24, 1950—the day after he entered the hospital—the witness interpreted it as showing "a 2:1 heart block and a left ventricular strained pattern." Speaking of heart block, Doctor Mountain testified: "A heart block is a general term, but in this particular case we are referring to Doctor Watters, we refer to the heart block as being the auricles, or the receiving chamber, and the ventricles, which are the pumping chambers of the heart, were not pumping synchronously. In other words, the auricles were pumping about twice to the ventricles one."

The foregoing is a fair statement of Doctor Watters' condition during his first hospitalization, when he entered as a very tired man. He came out of the hospital improved over his entering condition. He was dismissed on January 11, 1951, and went home and rested for the remainder of the month and went back to his office to work on February 1, 1951. Thereafter he went to Doctor Mountain's office for periodical physical checkups. He kept himself in such condition that he was able to do an exceptional amount of work. Mrs. Betty Minor was his receptionist and bookkeeper, from June 1949 until September 1952. As a witness for plaintiff she recalled Doctor Watters' hospitalization in December 1950 and January 1951. She testified: "He remained in the hospital until the 11th of January, 1951, he came back to work at the office around the first of February. He saw patients right away, taking the rest of the year 1951 all through, he saw patients during all of that period. We were always busy. He wasn't there every day. In 1952 up through the fifteenth day of September when I left he saw patients during all of that period, the same as the year before, perhaps more patients. I made up these records when I was there and kept them. * * * I will read into the record the month and the number of patients each month starting with April, 1951. April of 1951, 566; May, 686; June, 680; July, 593; August, 542; September, 489; October, 595; November, 574; December, 457; January of 1952, 559; February, 572; March, 542; April, 471; May, 437; June, 468; July, 479; August, 469. Total 9159 patients."

Mrs. Charlotte Cathell succeeded Mrs. Minor as receptionist in Doctor Watters' office in September 1952, and worked there until his death. She kept a record of all patients who were treated at the office. She made the office record thereof from August 30, 1952, to and including November 25, 1952. She began work on September 13, 1952. Including that day and the remainder of that month, the doctor saw 294 patients. The highest number on particular days was 33 on September 23, and 31 each day of September 16 and 18. The total number for September, including the first twelve days of the month, was 534 patients. The number of patients, respectively, in October and November of 1952, was 483, and 419 to November 25, the day of the accident,

and the last day he was in the office. On that day he gave attention to twenty patients. The doctor usually tried to get away from the office as soon as possible after four o'clock in the afternoon. On that day he left between four and four-thirty p.m.

Both receptionists testified that there was no couch in the office, and that the doctor never made a practice of lying down at the luncheon hour. Mrs. Minor said his vacations were short and few, and at other times he was busy with his patients; that she never saw him taking a rest, nor did she observe him taking digitalis or other medicines; that commencing April 1, 1951, she saw the doctor everyday except Sundays, and when he was on vacation. He worked outside of the office, usually in the mornings making house calls, or at the hospital or at the place of business of the Homesteaders Life Insurance Company. She often called him at the latter place. Mrs. Cathell gave like testimony. Of his actions on November 25, 1952, she testified: "He did not make any complaint to me about illness or sickness. He looked like anybody I can see, he looked all right to me and I don't think there was anything wrong. He looked healthy to me, spry as he could be." Dr. Hugh S. Watters, son of the insured and a dentist, had his office in the same suite as that of his father. They used the same reception room. The son was in a place where he had general knowledge of his patients and the extent of his practice. He estimated that his father averaged twenty-five office patients daily. He was in his father's office on November 25, 1952, and observed that he was busy, and had the appearance of one who was not suffering physically.

When Doctor Watters left his office in the late afternoon of November 25, 1952, the rain which had been falling changed to a wet, clinging snow. His wife, the plaintiff, testified: "I recall the 25th day of November, 1952. Doctor Watters arrived home about five o'clock that evening. The weather was snow, snowing in the afternoon and late evening. We had dinner about 6:30. After we finished dinner we visited awhile and read the newspaper and looked at television. * * * Up to that time there was nothing unusual. After we looked at the television I got up and walked out to the kitchen to wash my dishes about 9:30. In a few minutes * * * Doctor Watters walked through the

kitchen. There is a small hall on the side of the kitchen and he had to walk out there, and I couldn't see where he went from there, but there is another hall that leads to the bathroom, and one leads to the basement, but I couldn't see him. * * * I went on with my work. The doctor showed up about fifteen minutes later. I first saw him in this small hall right off the kitchen. We have a round stool there, rather high. He was just leaning over holding onto the stool like this (indicating) and he was in pain. I asked him what the trouble was. He said he slipped and fell down by the small garage door. * * * He said he went down there to let the dog out. I put him in when we were going to eat. The dog was a black Cocker. We had had him nine years. When I talked to Doctor Watters he appeared to be in pain. After I talked to him he went back into the other room—the dining room—and sat down in his big chair, where the television is, where he usually sat in the evening."

Speaking of Doctor Watters' fall, on cross-examination Mrs. Watters said: "The fall occurred down by the small garage door. * * * Garage is under the house. There was snow there. The garage was covered with a roof. Snow was not in the garage. It was in the opening in the door itself. There is a little drop there and he must have stepped on that slope and fell, slipped on it. * * * I didn't say it snowed into the floor, but when it banked up against the door and you open it, it pushes inside the door sometimes. The garage was generally dry. Most of the ground and trees and everything were covered with snow. * * * He slipped outside the small garage door is what he told me, I didn't see him. * * * It was heavy snow, it was wet and clinging to the branches. * * * In letting the dog out it wouldn't be necessary for Doctor Watters to go out, the way that door was arranged. Of course if he would put his foot right on there when he opened the door, this little drop there is dangerous, and if you step there your feet go out away from you. There are no steps inside the house, just this little gradual drop. It slopes down. That is exposed to the weather. It is right outside the small door. It is right outside of the door, the two large and the small one. A gradual slope there. * * * The door swings inward and sometimes snow drops in when you open it. In order

to let the dog out it would be necessary to go to where that door is and open the door and pull it in. You don't have to pull it very far, but if you happen to step on that it is slick—like outside the door. It has happened to me a good many times." Continuing with the cross-examination, Mrs. Watters said: "* * * Doctor Watters said he slipped and fell outside the small garage door. That is what he told me. He didn't slip on the steps, no he didn't slip and fall on the steps. * * * But when you open the door there is a gradual rounding slope and if you step outside that door, one of the larger doors is dangerous because your feet just go away from you. There doesn't have to be a lot of snow, just a little ice. * * * I did not assist him from the stool to the living room. He walked himself holding his side. As he was standing there leaning on the stool his appearance was that he was just suffering pain. * * * The pain was in the region of his chest, this is where he said, right down here (indicating) is where he was holding his hand, where he fell. * * * There were two large doors in the garage and one small one, and that is the door Doctor Watters had reference to."

There was no objection to any of this testimony. Much of it was brought out on cross-examination. Doctor Watters' statement to his wife, as he leaned over the stool in the hallway in pain after returning from letting the dog out through the garage door in the basement, that "he slipped and fell down by the small garage door" was admissible as part of the res gestae. Califore v. Chicago, St. P., M. & O. Ry. Co., 220 Iowa 676, 679–681, 263 N.W. 29; Aldine Trust Co. v. National Benefit Acc. Assn., 222 Iowa 20, 25, 268 N.W. 507; Vernon v. Iowa State Traveling Men's Assn., 158 Iowa 597, 600, 138 N.W. 696. Defendant so concedes.

Doctor Watters remained at home from the time of his fall Tuesday night, November 25, 1952, until about four o'clock in the afternoon of Thursday, November 27, when he was taken to the Iowa Lutheran Hospital. During all of this time he was suffering much pain. On Wednesday he taped the left side to reduce pain. On Thursday he had his son, Dr. Hugh S. Watters, and Mrs. Watters put more tape over that which he had put on. He was in the hospital to the time of his death at about 4:20 in

the afternoon of December 12, 1952. He was fifty-nine years and three months old at the time of his death.

There were admitted in evidence and certified to this court numerous exhibits, some originals, but mostly photostats of electrocardiograms, X-ray pictures, clinical charts, clinical records and reports of various kinds of the three periods of Doctor Watters' hospitalizations of December 23, 1950 to January 6, 1951, of January 7 to 11, and of November 27, 1952 to December 12, 1952. Dr. George E. Mountain attended the patient during all of these periods, and examined and treated him at Doctor Mountain's office during the time intervening between the last two hospitalizations.

I. The first assigned error which defendant argues as a ground for reversal is the trial court's overruling of defendant's motion for a directed verdict in its favor at the close of all of the evidence.

As contended by defendant, the burden was upon the plaintiff to establish, as alleged in her petition, that her husband, Doctor Watters, the insured, by an accidental fall received bodily injuries, which, independently and exclusively of all other causes, resulted in his death. Defendant asserts that "plaintiff wholly and completely failed to meet or discharge this burden of proof in that evidence produced and introduced by the said plaintiff and defendant established that said insured's death was caused solely by heart disease * * * from which * * * the insured had been suffering for a period of more than two years. That the evidence * * * viewed in its most favorable light for the plaintiff reveals that at most the alleged accidental fall, if any, and the diseased condition of insured's heart and arteries and other diseases from which he suffered, co-operated, concurred and combined to  cause his death * * *."

The district court necessarily thought that the existence of the factual matters inherent in plaintiff's burden of proof was for the determination of the jury, and denied defendant's motion to direct the verdict. Implicit in the verdict of the jury is its finding that plaintiff established all facts essential to a judgment on her cause of action. We agree with the ruling on the motion and with the verdict of the jury.

The first essential for the plaintiff to establish was the accidental fall. We have set out the record on this point. The doctor reached home about five o'clock, at which time or later he took off his coat and shoes and put on a pajama jacket and house slippers. He and his wife looked out the window and enjoyed the snow-covered trees and shrubbery. There is no evidence that he was suffering in any way. He had done a full day's work at his office and left it at his usual time. He had given attention that day to twenty patients. Dr. Daniel A. Glomset, a witness for defendant, testified that fifteen patients made a good day's work for a doctor in his office.

After he told Mrs. Watters of his fall, the doctor walked unassisted into the living room and sat in his big chair. He was in great pain day and night at his home and went to the hospital about four o'clock Thursday afternoon, November 27, 1952. An X ray was taken which showed a fracture of the eighth rib on the left side of the chest, in the vicinity of the heart. The excruciating pain continued while he was in the hospital, and the clinical record shows very extensive doses of sedatives of various kinds were given to him. It was the testimony of doctors for plaintiff that the severe pain was not caused by the injury to or fracture of the rib itself, but to the fact that in the fall on the cement entrance to the garage the rib was crushed against the heart and injured the heart muscle, and it was this traumatic injury to the heart muscle which caused the excessive pain.

Is there anything strange, fanciful or unbelievable in the testimony presented to the jury respecting this fall or its happening or cause? Here was a doctor who had been hospitalized for a bad heart in December 1950 and January 1951, and was dismissed as improved on the eleventh day of the latter month, and after a few weeks of rest and cessation from work went back to active practice, and from April 1, 1951 to November 25, 1952, at 4 p.m. gave professional service in his office to 10,615 patients. During that period of time there is no evidence that he suffered from any cardiac failure. He lost no time from his work. In addition to this office work he had much outside practice. What is the answer of defendant to this showing? It does not even concede that Doctor Watters fell. Always and repeatedly through-

out its printed argument whenever the word "fall" is used, it is directly followed by the phrase "if any." Defendant says if Doctor Watters did fall it was not from slipping on the wet snow covering the rounded and sloping cement entrance outside of and under the doors of the garage, but he fell, if he fell, from a "Stokes-Adams syndrome, syncope, or attack." The proper names Stokes and Adams refer to eminent Dublin physicians, who did early research in heart ailments. In layman's language the term simply means a swooning or fainting caused by some heart weakness. In short, defendant's sole answer to plaintiff's evidence that Doctor Watters accidentally fell was that he swooned from a heart attack after a quiet, relaxed evening at home, while letting the dog out, although he had never so fallen in almost two years of hard and exacting service in his pro-. fession, or at any prior time.

Doctor Mountain was a witness for plaintiff. Defendant speaks highly of him in this court as an able doctor and a fair witness. When he was asked on cross-examination if one afflicted with a heart condition as Doctor Watters was in December 1950 would be likely to suffer a Stokes-Adams attack, he answered: "I don't think there is any relationship there."

Dr. Harold Margulies, a witness for plaintiff, on cross-examination said: "I see no evidence of Stokes-Adams attack. It would cause him to fall if he had it. He didn't have it."

Dr. Walter Anderson and Dr. Robert A. Weston, witnesses for plaintiff, testified that no cardiac failure had anything to do with the fall and death of Doctor Watters.

For defendant, Dr. Philip G. Keil and Dr. Daniel A. Glomset testified that Doctor Watters would be very likely to have a Stokes-Adams attack.

There is substantial evidence that Doctor Watters' fall was accidental.

II. The second essential to recovery of judgment by plaintiff was that she established, by substantial evidence, that the death of the insured was caused by injury to his heart as the result of his fall, independent and exclusive of all other causes. It is the contention of plaintiff that the improvement of the insured's heart condition after his dismissal from the hospital on

January 11, 1951, and his rest immediately thereafter, and the intermittent attention he received from Doctor Mountain in the following months, together with the insured's many months of exceedingly active and onerous professional service, as shown in Division I of this opinion, offer strong support to her position maintained in this Division II hereof that the traumatic injury— the lesion and physical wound—to the muscles or myocardium of Doctor Watters' heart, was the efficient and sole cause of his death. It is her contention that this wound from the crushing of the seventh and eighth ribs against the heart so impaired its muscular fibers that they failed to properly function in the operation of circulating the blood. Such an injury to the heart muscle in the language and literature of the medical profession is termed a "myocardial infarction." An infarction may be caused by disease. But the absence of any symptoms of such disease for many months before and the immediate disability following the fall strongly support plaintiff's position that the infarction was caused by the physical blow.

The testimonial support for the contentions of both parties necessarily is largely from opinions of those of the medical profession. Doctor Mountain was the only one of these who had ever attended the insured professionally. He alone could testify from personal knowledge. The other medical witnesses based their opinions on long hypothetical questions in which the truth of factual items gathered from the testimony was assumed. We mentioned first the expert opinion testimony for plaintiff. Doctor Mountain testified: "From my observation of Doctor Watters and my examination and treatment of him I would say that the injuries which he received when he slipped and fell on November 25, 1952, produced or set up a chain of reaction which caused his death. I would say that would be it."

Doctor Margulies when asked if myocardial damage was something distinct from congestive heart failure, answered: "Yes. That [myocardial damage] refers actually to a change in the anatomy of the heart in which there is damage to the heart muscle, and refers to actual destruction of some of the functioning tissues of the heart. It may be of a 'traumatic nature.'"

This witness, when asked his opinion as to the cause of the insured's death, based on a hypothetical question, answered:

"I believe his death was due to the fall which occurred, which injured the chest wall and the underlying structures.

"Q. Doctor, will you explain to the court and the jury in what manner the injuries sustained by Doctor Watters when he slipped and fell caused or produced his death? A. Yes, I believe that the injury produced damage to the heart muscle itself known as myocardial infarction, which resulted in his death.

"Q. Would you say that any disease other than this which you have just mentioned caused or effected Doctor Watters' death? A. No.

"Q. Would you say that any disease or abnormal condition other than the condition which you have just stated was produced by his injury when he slipped and fell, contributed to his death? A. No.

"Q. Will you explain what is meant by this myocardial infarction? A. Yes. Myocardial infarction is a diseased state in which there is an interruption of the normal nourishment of a portion of the heart which causes death of some of the functioning muscle tissue. As a result of that the heart muscle function becomes very weak. There is a suffusion of blood into the area and then the damaged heart muscle is eventually, if long enough time elapses, replaced by fibrous tissue, by scar tissue, that is. It is an entirely separate and distinct condition from this congestive heart failure."

After examining an electrocardiogram of Doctor Watters' heart, taken on December 8, 1952, Doctor Margulies testified: "There is a difference between this electrocardiogram and the preceding one in V-3 where there is now an absence of a delayed R wave which was formerly present in the preceding electrocardiograms * * *. That is significant. In the presence of right bundle branch block the disappearance of this particular wave is associated with muscular heart damage known as myocardial infarction."

Dr. Walter Anderson, after hearing the same hypothetical

question as was presented to Doctor Margulies, gave his opinion of the cause of Doctor Watters' death, thus:

"It is my considered opinion that the cause of death was a traumatic myocardial infarction secondary to contusion of chest wall and heart incurred in the fall and injury of the left chest. I think it was the fall on November 25, 1952, that caused his death.

"Q. Doctor, will you say whether or not any other disease, other than that which you have just stated was produced by this fall, caused or effected Doctor Watters' death? A. I don't think any other disease had anything to do with it. I don't believe that any disease other than this condition we have just spoken of, produced by Doctor Watters' injuries when he slipped and fell, contributed in any way to his death.

"Q. Doctor, would you say a fall and the resultant fractured rib and concussion and contusion to the chest area and chest wall sustained by Doctor Watters when he fell could have killed a man with a normal heart? A. Yes. Definitely."

Dr. Robert A. Weston, over fifty years in the practice of medicine in Des Moines, being asked the hypothetical question propounded to the doctors who preceded him as witnesses, and his opinion as to the cause of Doctor Watters' death, answered: "By accidental fall, he had a fracture of his ribs and internal hemorrhage. This internal hemorrhage and the fracture of his ribs were the direct result of the fall. I would say that no disease or abnormal condition other than what I just mentioned here— this hemorrhage and these contusions—contributed to his death. Such a fall as Doctor Watters sustained and the concussion and blow to the chest wall could have killed a man with a normal heart. I have had professional experience with people with enlarged hearts and heart conditions. The prognosis of a person with a large heart under careful management live their normal expectancy, usually."

Defendant's expert witnesses each gave opinions of the cause of Doctor Watters' death in response to its hypothetical question. Dr. Philip G. Keil, answered: "It is my opinion that Doctor Watters died of heart failure and not of myocardial infarction." He said he saw no evidence diagnostic of myocardial infarction

in the electrocardiogram respecting which Doctor Margulies had testified of the absence of the R wave.

Dr. Daniel A. Glomset responding to defendant's hypothetical question said: "I believe that Doctor Watters died of congestive failure and additional etiologic and causative agents which *might possibly have been assumed* to be due to a sluggish kidney function and that the fracture of his ribs *may have* aggravated the already present heart disease. That he finally—that his death was contributed to by poor oxygenation of the circulation to his brain, as a result of the heart failure and of the remarkably slow pulse which was present. * * * I cannot conceive of any definite evidence in this case which points toward a myocardial infarction." (Italics ours.)

As bearing upon the probative weight or value of the testimony of this witness we set out the following from his cross-examination: "My interest in this case is telling the truth as I see it. There is no side, the truth is down the middle, as far as I see. Yes, sir, I have been interested in this case. I first became interested a week ago, about a week ago. I became interested in trying to determine the truth as I saw the truth. I spent Monday here at the counsel table assisting counsel in the trial of this case. I did. I wrote out questions and handed them to counsel to ask witnesses that were on the stand. I have not consulted with the plaintiff in any way in order to help arrive at the truth and justice of the matter. I have an interest to determine the truth as I see it. * * * I expect to be paid for my services. I expect to be paid by Mr. Grothe and Mr. Parker and their client. They solicited me for my services. I have consulted with them from time to time."

There are many cases involving matters of which the average juror has little knowledge. In such cases witnesses having superior knowledge of the subject are essential and of great aid to the litigants and to the trial tribunals. Nevertheless, because of abuses respecting such testimony, expert witnesses for many years have been the object of deserved criticism by the courts. As said by Mr. Justice Curtis, in Wilkinson v. Greely, 29 Fed. Cas. 1259, 1263, 1 Curt. 439, 450, "* * * it is a common remark, that where there is any room for a difference of opinion, experts,

in about equal numbers, will generally be found testifying on each side."

In Roberts v. New York Elevated R. Co., 128 N. Y. 455, 464, 474, 28 N.E. 486, 487, 13 L. R. A. 499, by Peckham, J., the New York Court of Appeals said: "Expert evidence, so-called, or, in other words, evidence of the mere opinion of witnesses, has been used to such an extent that the evidence given by them has come to be looked upon with great suspicion by both courts and juries * * *. He [the expert] comes on the stand to swear in favor of the party calling him and it may be said he always justifies by his works the faith that has been placed in him."

"The present system of presenting the testimony of experts, in the courts, is poorly calculated to assist in arriving at the exact truth. The expert produced as a witness has almost invariably given assurance that he will swear to an opinion favorable to the party calling him, and for this he usually receives a fee proportioned to his estimate of the value of his opinion to the side for which he testifies." Potter v. McAlpine, 3 Demarest, Surr. N. Y., 108, 121.

Many more like comments could be cited, and while they are applicable to too many particular instances, they do a grave injustice to the host of persons of study, experience and skill in a particular art or science, who, as witnesses in judicial investigations, fairly and conscientiously seek to aid by giving the light which their superior abilities may throw upon the subject.

Dr. Deidrich J. Haines, expressing his opinion to the hypothetical query, said: "In my opinion this man died of congestive heart failure, the result of aortic valvular disease of long standing. The records do not in my belief reveal that he had suffered a myocardial infarction. * * * There is nothing about Exhibit 10 [the electrocardiogram referred to by Doctor Margulies] that indicates to me as a doctor that Doctor Watters had suffered a myocardial infarction, no, Sir."

It has been said that "an ounce of fact is worth a pound of opinion." Alston v. Jones, 17 Barbour, N. Y., 276, 298. The hard core of undisputed fact testimony of Doctor Watters' continuous service for almost two years prior to his accidental fall—

substantial, tangible evidence which one can get a solid grip on, and which is wholly lacking on defendant's side—gives strong support to the opinions of plaintiff's medical witnesses as to the cause of death of Doctor Watters. The able trial court rightly denied defendant's motion for a directed verdict at the close of all of the evidence.

Defendant has cited Binder v. National Masonic Acc. Assn., 127 Iowa 25, 102 N.W. 190; Delaney v. Modern Accident Club, 121 Iowa 528, 97 N.W. 91, 63 L. R. A. 603; Vernon v. Iowa State Traveling Men's Assn., 158 Iowa 597, 138 N.W. 696; Michener v. Fidelity & Casualty Co. of New York, 200 Iowa 476, 203 N.W. 14, and other cases of this and other courts. A discussion of them would serve no purpose. Without questioning those opinions, they do not rule the determination of this appeal, because of the difference in the factual situations in those cases and in this one. In fact there is much in them favorable to the plaintiff.

III. What we have said hereinbefore disposes of defendant's second assigned error that plaintiff failed to prove the insured's fall was accidental. The same is true of the third error assigned, that if defendant's motion for a directed verdict was not good, then its alternative motion to withdraw from consideration of the jury all of plaintiff's claim except $500 should have been sustained. Both assignments are without merit. It is also true of the eighth error assigned, that the court erred in overruling defendant's motion non obstante veredicto.

IV. Defendant complains of the court's Instruction No. 3. In it the jury was told that to recover plaintiff must prove:

"That on the 25th day of November, 1952, Doctor Watters, through accidental means, received bodily injuries, which independently and exclusively of all other causes resulted in his death within 90 days after receiving said bodily injuries.

"If you find the plaintiff has established this proposition by a preponderance of the evidence then plaintiff would be entitled to recover the sum of $5000, unless the defendant has established by a preponderance of the evidence the only amount due under the Certificate of Membership was the sum of $500 as is claimed

by the defendant under paragraph H of the by-laws of the defendant-association, as set out in the Statement of Issues herein.

"If you find plaintiff has not established the above proposition by a preponderance of the evidence, then the plaintiff would not be entitled to recover any sum, and your verdict would be for the defendant-association."

For argument in support of this assigned error, defendant states: "We have fully discussed this proposition under Division IV." The error assigned in that Division is the court's failure to give defendant's requested Instruction No. 1, to wit:

"You are instructed that the burden is on the plaintiff to prove by the greater weight or preponderance of the evidence that the deceased * * * did on the 25th day of November, 1952, receive bodily injuries through accidental means which independently and exclusively of all other causes resulted in his death within ninety days after said date. You are further instructed that the term 'independently and exclusively of all other causes', as used in these instructions, means that Phil Ganz Watters, at the time of the accidental fall, *if any,* occurred, was free from any disease, including heart disease, which in any way co-operated or concurred with the accidental fall, *if any,* and the resultant injuries, *if any,* to cause his death.

"Therefore, if you find that on the 25th day of November, 1952, Phil Ganz Watters, at the time and place alleged in the plaintiff's petition, received bodily injuries through accidental means which independently and exclusively of all other causes resulted in his death within ninety days, then your verdict should be for plaintiff in the sum of $5000. However, if you find that plaintiff has failed to prove by a preponderance or greater weight of the evidence that at the time of the accidental fall, *if any,* occurred, the decedent * * * was free from any disease, including heart disease, which in any way co-operated or concurred with such accidental fall, *if any,* and the resultant injuries, *if any,* to cause his death, then the verdict should be for the defendant." (Italics ours.)

The court's instructions and statement of the issues, read as a whole, fully and fairly informed the jury both as to the issues

of fact, which it was essential that plaintiff establish to recover judgment as prayed by her, and as to the factual issues alleged in defendant's answer as complete defenses to the allegations of plaintiff's petition. Defendant complains because the court did not define the words "which independently and exclusively of all other causes resulted in his death" in Instruction No. 3, by the specific words recited in defendant's requested Instruction No. 1. The quoted words used by the court were the identical words used in the Certificate of Membership, by the plaintiff in her petition, and by defendant in its answer. They were the identical words chosen by defendant to put in its insurance contracts which it offered to the insured and to the public.

These words were plain, simple, in everyday use, and readily understood by the people generally. Their meaning could not be made clearer by definition or by use of other words of the same meaning. A court, after using words plainly and fairly expressing a statement, is not required to restate it by synonymous words. Such practice would be of no benefit, and might, by adding volume, tend to confuse.

The instruction as given was fair to each party, while the one requested, by the use of the italicized words, sought to have the court call to the attention of the jury, by repetition, the doubt that the insured had an accidental fall. An attorney should present his client's cause with zeal, but the court must state the issues and the applicable law with impartiality.

The last sentence of the requested instruction was an erroneous statement of the law, in that it placed upon plaintiff the burden of disproving the affirmative defenses pleaded by defendant.

The court did not err in giving its instruction, nor in refusing to give defendant's requested Instruction No. 1.

V. In its requested Instruction No. 2, defendant asked that the jury be told the burden was on the plaintiff to prove the insured came to his death by bodily injuries received by an accidental fall, and if the jury found the fall was caused by disease, the verdict should be for defendant. These matters were fully covered in the court's instructions, and the court rightly refused the requested instruction.

VI. In defendant's requested Instruction No. 3 the jury was told that if it found insured's death was caused by heart disease, as provided in paragraph H or under any other paragraph of the certificate, it should return a verdict for defendant. The request was covered in the court's instructions. There was no error in the refusal.

VII. One of the grounds for defendant's motion for new trial was based on the following matters. One of the attorneys participating for defendant in the trial was Addison M. Parker. His affidavit was attached to defendant's motion for new trial. It concerned some conversations he had with Doctor Margulies relative to the latter's testimony. The doctor made a counteraffidavit which was attached to plaintiff's resistance to the motion for a new trial. The substance of it is that: Shortly after the trial Doctor Glomset discussed the testimony of Doctor Margulies with the latter and was highly critical over his having stated his opinions and conclusions with definiteness; knowing that Doctor Glomset testified for defendant and had also sat at the attorneys' table during the trial and assisted and consulted with defendant's attorneys, Mr. Parker and Mr. Grothe, he was moved to call Mr. Parker, a long-time friend whom he had treated professionally, feeling that Doctor Glomset's criticism might reflect a similar viewpoint or feeling on the part of Mr. Parker, and he wished to make sure that his testifying as an expert for plaintiff did not affect the personal relationship and friendship; he thought this call concluded the matter, but thereafter Mr. Parker called at his office and discussed his testimony, and since he (Margulies) had no transcript of his testimony he was led to believe that it was different from his recollection of it; thereafter Mr. Parker presented to him an affidavit and requested him to sign it "for such use as he might make of it"; subsequently he (Margulies) secured a transcript of his testimony and after reading it he declined to sign the affidavit; later he read the affidavit of Mr. Parker, referring to the conversation between them, and found that the statements in the affidavit did not correctly express the thoughts he intended to convey in the conversations; and after reviewing his testimony at the trial he found that it truly expressed his opinions of the matters involved, and

that if called again to testify his testimony would be the same as in the transcript. The affidavit was made on April 12, 1954.

The affidavit of Mr. Parker was made on April 8, 1954, and stated in substance that Doctor Margulies had told him that he felt he had been too positive in certain statements " 'under the stress of a rigorous cross-examination' ", and that " 'It is probable that the enlargement of the heart made the possibility of myocardial infarction greater in the event of a fall. It is possible that the congestive heart disease increased the possibility of a fatal outcome from myocardial infarction.' " The affidavit also stated his belief that on a new trial, Doctor Margulies would make clear his views on the matter.

The affidavit, supra, of the doctor is to the contrary. It appears to this court that testimony as to the "probable or possible, possibility" of a controversial matter would carry little weight on a controversial matter with any jury.

After the resistance to defendant's motion for new trial was filed, defendant, on April 15, 1954, filed an application for an order authorizing it to have Doctor Margulies subpoenaed forthwith for examination at the hearing on the motion for new trial.

The application was denied as was the motion for new trial. The motion and the resistance are too long to summarize, but we have read them carefully. They cover only matters which we have passed upon herein. The court did not abuse its discretion in denying defendant's application, and rightly denied the motion for new trial. We find no reversible error in any matter presented, and the judgment is affirmed.—Affirmed.

All JUSTICES concur.