**James A. JACKSON and William R. Jackson, by his Brother and Next Friend, James A. Jackson, Plaintiffs,**

**v.**

**CONTINENTAL CASUALTY COMPANY, Defendant.**

**Civ. No. 6–1732–C–2.**

United States District Court
S. D. Iowa,
Central Division.
April 18, 1967.

Max Putnam, Des Moines, Iowa, for plaintiffs.

John A. Blanchard, Des Moines, Iowa, George J. Lempke, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

HANSON, District Judge.

These rulings are predicated upon defendant's motions for judgment notwithstanding the verdict and for new trial.

This action was commenced by James A. Jackson and William R. Jackson, by James A. Jackson, against the Continental Casualty Company. The plaintiffs are beneficiaries of William R. Jackson, deceased, under a loss of life accident indemnity insurance policy. On February 6, 1965, the insured suffered a heart attack after helping to carry one Herman F. Anderson from the bathroom of the Anderson residence to the den. He was hospitalized in Mercy Hospital in Des Moines, Iowa, on the same day and died on February 18, 1965.

The clause of the policy which is in dispute in the case at hand insures against "bodily injury caused by an accident occurring while this policy is in force and resulting directly and independently of all other causes of loss covered by this policy." The jury returned a verdict for plaintiffs.

The grounds set forth in the motions overlap a great deal. As this Court views the motions, four central issues are pointed up for determination: (1) Whether the jury was correctly instructed upon what constitutes an "accident" within the meaning of the policy; (2) Whether the evidence was sufficient to sustain a finding that there was an accident; (3) Whether the Court's concept of the standards of causation to be assigned to the phrase "directly and independently of all other causes" is erroneous; and, (4) Whether the court erred in admitting certain evidence.

The Court instructed the jury that:

"The word 'accident' as used in this case means happening by chance, unexpectedly taking place, not according to the usual course of things.

You are instructed in this regard that if the insured does a voluntary act, the natural, and usual, and to be expected result of which is to bring injury upon himself, then a death so occurring is not an accident. But if the insured does a voluntary act, without knowledge or reasonable expectation that the result thereof will be to bring injury upon himself from which death may follow, then a bodily injury resulting in death is caused by an accident."

This instruction finds clear support in the Iowa cause law. See, e. g., Clarkson v. Union Mutual Casualty Co., 201 Iowa 1249, 207 N.W. 132; Rowe v. United Commercial Travelers' Ass'n, 186 Iowa 454, 172 N.W. 454, 4 A.L.R. 1235; Budde v. National Travelers' Beneficial Ass'n, 184 Iowa 1219, 169 N.W. 766; Lickleider v. Iowa State Traveling Men's Ass'n, 184 Iowa 423, 166 N.W. 363, 168 N.W. 884, 3 A.L.R. 1295; Lehman v. Great Western Accident Ass'n, 155 Iowa 737, 133 N.W. 752, 42 L.R.A.,N.S., 562; Payne v. Fraternal Accident Ass'n, 119 Iowa 342, 93 N.W. 361; Smouse v. Iowa State Traveling Men's Ass'n, 118 Iowa 436, 92 N.W. 53; Feder v. Iowa State Traveling Men's Ass'n, 107 Iowa 538, 78 N.W. 252, 43 L.R.A. 693; Carnes v. Iowa State Traveling Men's Ass'n, 106 Iowa 281, 76 N.W. 683.

The recent case of Simpson v. Skelly Oil Company, 371 F.2d 563 (8th Cir.), clarifies the functions of a judge sitting in Iowa when passing upon motions for judgment notwithstanding the verdict and for new trial. In contemplating a motion for judgment n. o. v., the trial judge must accept the plaintiff's version as true even though strong testimony to the contrary is present—no weight value is to be assigned to the evidence. Viewing the evidence most favorably to plaintiff, there must be substantial evidence to support the verdict. On the other hand, the trial judge has a wider latitude in considering a motion for a new trial. He may set aside a verdict that is against the greater weight of the evidence or to prevent injustice.

One Emil Carlson testified that he and Herman F. Anderson had been at a Mitchellville, Iowa, 4-H meeting and were returning to Des Moines when Mr. Anderson complained of having to go to the bathroom. It was decided that he would wait to relieve himself until they got to his home in Des Moines. Mr. Carlson had just parked in Anderson's driveway when Mr. Anderson fell as he was getting out of the automobile. He could not get up so Mr. Carlson helped him into the house. Mr. Anderson took off his coat and hat and went into the Anderson's half-bath without assistance. A short time later Mr. Anderson called to Emil Carlson for help as he could not get up from the toilet stool. Mr. Carlson found that he was unable to assist Mr. Anderson in arising and Mrs. Anderson placed a call to the William R. Jackson residence (hereinafter called Judge Jackson). Judge Jackson was their son-in-law. Judge Jackson and his son, William Jackson, arrived ten or fifteen minutes later. Prior to their arrival, Mr. Carlson stood behind Mr. Anderson holding him in order to prevent him from falling.

William Jackson testified that he received the telephone call in relation to Herman Anderson's dilemma. Judge Jackson was watching television at the time. He was told of the situation and the two proceeded to the Anderson home.

When they arrived, they found Emil Carlson supporting Mr. Anderson. Mr. Anderson was grasping the rim of a lavatory to the left of the stool. William Jackson testified that his left foot was entangled behind a leg supporting the lavatory. Emil Carlson testified that the foot became caught as they were carrying Mr. Anderson out of the bathroom.

William Jackson testified that they decided to carry Mr. Anderson into the den and place him upon a couch. They first unloosened his grip upon the lavatory rim and pried his foot away from the lavatory support. In regard to these tasks, William Jackson stated that "his movements were that they weren't helping us." Mr. Carlson took hold of Herman Anderson around the shoulders beneath the armpits, William Jackson took a position at the midsection area, and Judge Jackson placed himself in the vicinity of the thighs or ankles.

Emil Carlson testified to the effect that he and William Jackson first tried to remove Mr. Anderson and he thought that Judge Jackson helped before they got through the door. William Jackson testified that the three of them lifted Mr. Anderson from the toilet seat after releasing Mr. Anderson's hand and extricating his foot. Mr. Carlson testified that he was 71 years old at the time of the incident, weighed about 175 pounds, and is approximately 5' 11". William Jackson stated that he was 19 at the time, is six feet tall, and weighs 165 pounds. He said his father was 5' 10" or 5' 11" and was slightly heavier than himself.

Both Emil Carlson and William Jackson testified that Herman Anderson grabbed or held onto the lavatory and bathroom door frame in the course of removing Mr. Anderson from the bathroom. William Jackson stated that Herman Anderson would grab onto various objects such as the lavatory, the wall, and the door "and, since I was in the middle of his body, or was holding him in the middle of his body, then it was most logical for me to try and free his hands." He related that the bathroom door swings inward and that it sticks out two or three

inches. He said Mr. Anderson grabbed it "and various parts of the door jamb." According to William Jackson, in order for them to negotiate their way through the door, he had to duck under Herman Anderson and "when I did this, I wasn't holding onto him at all or supporting him."

The next stage of the trip was the transportation of Mr. Anderson down a hallway to the door of the den. William Jackson testified that Mr. Anderson again grabbed various objects in the hallway. On cross-examination, he said that Mr. Anderson put the flats of his palms out against the walls which tended to stop progress.

As they were turning into the den, Emil Carlson noted that Mr. Anderson grasped the den door. William Jackson said that "again he was grabbing onto the door jamb and various objects around the door." In order for them to pass through the door, William Jackson again had to go underneath Herman Anderson. Mr. Anderson was placed on a couch just inside the door.

William Jackson said that the distance they travelled was about 15 feet. Emil Carlson said that it was not over 15 feet and that the time involved was from five to eight minutes.

William Jackson did not know whether Herman Anderson was conscious or not during the incident but "he was completely uncooperative." He concluded that his grandfather was probably conscious. He did not recall that Herman Anderson had said anything. William Jackson said he requested "him not to grab onto these things. We weren't going to drop him. But still he would continue to grab onto these various items or objects." Emil Carlson said he really couldn't say what was wrong with him. He presumed that Mr. Anderson was conscious. He might have had a gastric disorder or have been dazed from a seizure. Herman Anderson testified that he was unconscious and that most of the events that transpired did not register. He thought his trouble was passing out or blacking out. He was hospitalized for a week afterwards.

In response to an interrogatory as to whether Mr. Anderson was trying to brace himself by grabbing the sink, William Jackson said that he thought "he was trying to grab onto things too." He testified that the effect of his grandfather's actions "was more of a jerking motion. It would just jerk and tend to stop us just like boxcars hitting together. Mr. Carlson said that Mr. Anderson was afraid they would drop him and therefore held onto the lavatory, bathroom door, and den door. He said that it hampered them when he did so and also that he had to make certain he had a good grip.

Mr. Carlson and William Jackson both testified that Herman Anderson did not strike or kick and that he was not dropped. William Jackson did not observe Judge Jackson bump into anything.

■■ In regard to defendant's motion for judgment notwithstanding the verdict, this Court has no doubt as to the propriety of its submission of the accident issue to the jury. There is substantial evidence to support the verdict for plaintiffs, giving them all legitimate inferences that can properly be drawn from the evidence. The jury could reasonably conclude that Judge Jackson was summoned to the Anderson home in an emergency situation; that extraordinary strain was placed upon Judge Jackson from unforeseeable actions of Mr. Anderson; and that the ensuing myocardial infarction could not have been anticipated by Judge Jackson.

■ The scales still tip in plaintiffs' favor when the weight of the evidence is considered. Similarly, there is no injustice which merits a new trial. William Jackson and Emil Carlson were unequivocal in their conclusions that Mr. Anderson's actions caused sudden breaks in the continuity of the trip from the bathroom to the den. It can make no difference whether such conduct arose from a seizure or from a fear that he would be dropped.

William Jackson's testimony as to Mr. Anderson's grabbing or grasping presents a picture of greater frequency than the testimony of Emil Carlson. Also, Mr. Carlson thought that Judge Jackson joined the activity just before they reached the bathroom door, while William Jackson stated that he was present at the time they began to lift Mr. Anderson. This Court is inclined to place greater weight upon William Jackson's testimony on these matters. It must be remembered that William Jackson was 19 years old at the time of the occurrence and Emil Carlson was 71.

The defendant also objects to this Court's instruction upon the meaning of the language "directly and independently of all other causes." The precise phraseology has never been construed by the Iowa Supreme Court.

There are two lines of authority as to what the standards of causation are to be under accident policies in cases where there is evidence of pre-existing disease. Many jurisdictions adopt a proximate cause approach where a disease and an accident combine to produce a result. There can be recovery if the accident can be labeled by such terms as "active," "producing," "originating," "efficient," "direct," or "predominating" cause. Other Courts adopt a sole cause view. If the accident and disease combine or concur, the injuries are not sufficiently caused by accident to permit recovery. This Court must endeavor to determine which rule Iowa would adopt if it were faced with the quoted language.

The first case in which the interrelationship of a bodily condition and an accident were considered in regard to causation was Meyer v. Fidelity & Casualty Co., 96 Iowa 378, 65 N.W. 328. The policy provided that there could be no recovery for "injuries * * * resulting directly or indirectly from * * * vertigo * * * fits * * * or any disease or bodily infirmity." The insured died of a fractured skull. Immediately preceding the injury, he had been seen to stagger and fall down. By way of special interrogatories, the jury determined that the insured's death was not caused by fits, vertigo, or any disease or bodily infirmity but that his fall was caused by some temporary disorder or condition other than fits or vertigo. On appeal the defendant argued that death was proximately caused by some prior disorder, not from the fall. The Court held that if the disorder which caused the fall was temporary and unexpected, the injury was accidental and the trial court properly left the question of whether the disorder was of a temporary character to the jury. However, the Court went on to discuss what it apparently conceived to be a general principle in this area of law at 65 N.W. 328, 330:

"It seems to be a well-settled rule in insurance law to attribute an injury or loss to its proximate cause only; and, if this be true, the disorder, *whatever it may have been,* was but a condition, the fall being the sole and proximate cause of the injury. Lord Bacon's maxim that 'it were infinite for the law to judge the cause of causes and their impulsions to one another; therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree'—seems to apply to this character of cases."

The case of Delaney v. Modern Accident Club, 121 Iowa 528, 97 N.W. 91, 63 L.R.A. 603, is not in point as it did not involve a previous condition but rather blood poisoning resulting from an accident which caused death. But there is interesting dicta in the case. The Court, at 121 Iowa 528, 535, 97 N.W. 91, 94, quotes from Freeman v. Mercantile Mut. Accident Ass'n, 156 Mass. 351, 30 N.E. 1013, 17 L.R.A. 753:

"Where different forces and conditions concur in producing a result, it is often difficult to determine which is properly to be considered the cause; and, in dealing with such cases, the maxim, "Causa proxima non remota spectatur,' is applied. This does not mean that the cause or condition which

is nearest in time or space to the result is necessarily to be deemed the proximate cause. It means that the law will not go further back in the line of causation than to find the active, efficient, procuring cause * * *. The law does not consider the cause of causes, beyond seeking the efficient, predominant cause * * *. An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, *even if he would not have died if his temperament or previous health had been different,* and this is so as well when death comes through the medium of a disease directly induced by the injury as when the injury immediately interrupts the vital processes." (Emphasis added.)

The contract in that case provided that the death had to result "solely from accidental injuries." The Court said that it could be argued in a situation in which a previous diseased condition contributed to the effect of an accident that the death did not "result solely from accidental injuries." The Court made that statement without mention of the Meyer case.

In Binder v. National Masonic Accident Ass'n, 127 Iowa 25, 102 N.W. 190, the insured was discovered in a bathtub, where he had gone to take a bath, in an unconscious and bruised condition. His condition revealed a bursted artery. There was evidence that the assured's arteries were in a diseased condition prior to the incident. The policy excepted "any death or disability happening directly, or indirectly, wholly or in part, accidentally or otherwise because of or resulting in or from any disease or bodily * * * infirmity" and the accident had been shown to be "sole and only cause" of the member's death. The Court held that the stipulation, as written, precluded recovery where the diseased state of the arteries aggravated the effect of the accident or contributed

to the resultant disability. *Delaney,* supra, is cited for support.

In Clark v. Iowa State Traveling Men's Ass'n, 156 Iowa 201, 135 N.W. 1114, 42 L.R.A.,N.S., 631, the decedent, while walking towards his son in a bathing pool, made a slight jump forward and a few motions with his hands, and then sank out of sight. The by-laws of the Association limited compensation to members who, through accidental means, received bodily injuries "independently of all other causes" and excluded deaths resulting "wholly or partially, directly or indirectly" from any disease or bodily infirmity. The Court held that the evidence was sufficient to sustain a conclusion that decedent was shocked by cold water which produced a fainting spell and caused death. The Court stated in 135 N.W. 1114, 1117, that:

"The clause in question undoubtedly means that an accident must be the immediate and final producing cause of death. Analogous to this is the provision relative to disease, bodily, and mental infirmity.' This can only apply where the disease is a cooperating ultimate cause of the injury."

The Court cited the *Meyer* case as controlling and said *Binder* was inapplicable without discussion.

Vernon v. Iowa State Traveling Men's Association, 158 Iowa 597, 138 N.W. 696, was the next decision to grapple with the causation problem. The articles of incorporation and the by-laws of the Association excepted death or disability "resulting wholly or partially, directly or indirectly" from disease or bodily infirmity. The evidence showed that a bruise had been sustained by the insured during a massage which had caused blood poisoning. The Association had contended that a kidney ailment caused his death. The Court held that the trial court sufficiently instructed the jury that plaintiff had the burden of showing the death to be solely the result of an accident. (Citing *Binder.*)

In Keen v. Continental Casualty Co., 175 Iowa 513, 154 N.W. 409, the insured died of a strangulated hernia. The de-

fense was interjected that he had suffered from a hernia prior to the accident. The policy provided for payments for bodily injury "effected, directly and independently of all other causes, through external, violent and purely accidental means."

The defendant insurance company sought reversal upon the trial court's causation instruction. The trial court's instruction was approved which in substance directed that if any prior defect contributed to the effect of the accident, there could be no recovery.

A very similar factual situation to the case at hand was considered by the Court in Licklejder v. Iowa State Traveling Men's Ass'n, 184 Iowa 423, 166 N.W. 363. The policy provided that there could be no liability where the disease of the insured resulted wholly or partially, directly or indirectly, from disease, bodily infirmity, or voluntary overexertion. The insured was attempting to remove a tire from his car. It was stuck and he proceeded to jerk at it until it suddenly came off causing him to slip or stagger back. He subsequently suffered a heart attack. Two physicians testified that he died of abnormal arteriosclerosis and obstruction of the coronary artery. They were of the opinion that his coronary arteries were "quite sclerotic." The trial court had directed the verdict. The Supreme Court determined that one probable basis for that action was that the insured had not died from an accidental cause. The Supreme Court held in 166 N.W. 363, 365, that:

"I. Was there any evidence on which the jury could be permitted to find that the death of Dunbar was the result of external, violent, and accidental means, independent of all other causes?

As we have seen, it is not open to doubt that the question whether he died of disease was for the jury. The only evidence tending to show that the death was the natural result of disease is that of the two physicians who express the opinion that he died of arteriosclerosis, which, as we understand it, is the technical term for hardening of the arteries; but this is met by other evidence that the sclerosis discovered in this case was such only as is ordinarily found in men of his size and age, and the weight and influence to be accorded to these conflicting opinions was for the jury. If the arteries of the deceased were sclerotic, but the sclerosis was such only as is the natural or usual accompaniment of increasing years, the fact, if it be a fact, that a bodily injury sustained by him would be more likely to be fatal than would be the case if such condition did not exist would not prevent a recovery on the policy should it otherwise appear that the injury was of the nature or kind described in the contract. Freeman v. [Mercantile Mut. Accident] Association, 156 Mass. 351, 30 N.E. 1013, 17 L.R.A. 753."

The next decision rendered in the line of Iowa decisions upon the subject is Michener v. Fidelity & Casualty Co. of New York, 200 Iowa 476, 203 N.W. 14. The plaintiff in that case sued upon an insurance policy for abdominal injuries allegedly resulting from two accidents. The policy insured the plaintiff against bodily injuries through accidental means resulting directly, independently, and exclusively of all other causes. There was evidence that plaintiff had been operated upon two or three times and that these operations could cause adhesions and intestinal obstructions. The Court cited *Binder* for the proposition that if a prior diseased condition aggravates the effect of an accident, there is no liability. The Court held plaintiff had not carried her burden of proof.

The latest pronouncement on the subject is embodied in *Watters v. Iowa State Traveling Men's Ass'n*, 246 Iowa 770, 69 N.W.2d 1. The policy in dispute provided for insurance against bodily injury through accidental means, independently and exclusively of all other causes. Certain factual matters will be briefly outlined which were found to substantially conform to the record. Dr. Watters, the

deceased insured, was admitted to Iowa Lutheran Hospital in Des Moines on December 23, 1950, to receive treatment for a serious heart ailment. He also had kidney congestion. Dr. Watters was released in an improved condition on January 11, 1951. He went back to work on February 1, 1951, and rendered medical services until he died on December 12, 1952. Mrs. Watters testified that he slipped and fell outside a small garage door at their home. Dr. Watters told her this after the incident. He was suffering from a pain in his chest region right after the accident and died some time later. Medical opinion bore out plaintiff's contention that Dr. Watters died of a myocardial infarction caused by the trauma of the physical blow. But there was also testimony supporting the view that he died of congestive heart failure due to aggravation of a pre-existing heart disease. The Court held that the issue of whether he died of an accident independently and exclusively of all other causes was for the jury. It would appear that this case sheds some light upon the destiny of the Iowa law in this rather confused area. The Court related in 69 N.W.2d 1, 11 that:

> "Defendant has cited Binder v. National Masonic Accident Ass'n, 127 Iowa 25, 102 N.W. 190; Delaney v. Modern Accident Club, 121 Iowa 528, 97 N.W. 91, 63 L.R.A. 603; Vernon v. Iowa State Traveling Men's Ass'n, 158 Iowa 597, 138 N.W. 696; Michener v. Fidelity & Casualty Co. of New York, 200 Iowa 476, 203 N.W. 14, and other cases of this and other courts. A discussion of them would serve no purpose. Without questioning those opinions, they do not rule the determination of this appeal, because of the difference in the factual situations in those cases and in this one. In fact there is much in them favorable to the plaintiff."

The trial court failed to define "independently and exclusively of all other causes." The defendant assigned error to the court's failure to submit its requested instruction No. 1 which, in essence, directed that plaintiff could not recover if heart disease in any way cooperated or concurred with the accidental fall to cause his death. The court did not feel it necessary to define those words.

There appears to be a dual line of authority upon which test of causation is applicable. The *Meyer, Clark,* and *Lickleider* cases seem to adhere to the majority rule. See Mahon v. American Cas. Co., 65 N.J.Super. 148, 167 A.2d 191, for a detailed analysis of cases. Those cases appear to be diametrically opposed to the cases discussed previously. Perhaps *Meyer* and *Clark* are factually distinguishable from the instant case in that they involved temporary ailments but it would appear that the principles enunciated by them are not so limited. A disorder may concur with an accident to produce bodily harm whether that ailment is temporary or permanent. Logically, the rules of causation in regard to either situation should not be divergent.

The *Lickleider* case is not ambiguous in its expression of the majority rule. The *Watters* case would appear to shed some light upon the future course of Iowa decisions. One rational explanation of the *Lickleider* decision and possibly the *Watters* case is that they implicitly recognize a different rule in heart attack cases. In *Watters*, the Court said that certain precedents were factually distinguishable. This Court is at loss to explain that statement other than by the fact that none of those cases involved heart conditions. This would appear to be consistent with the statement in *Lickleider* which points out that arteriosclerosis is a disease of the aged. Further, the Court in *Watters* did not deem it necessary to define the prerequisites of causation. Moreover, as will be seen, the testimony of three experts in the instant case indicates that recovery would be impossible in all cases in which an insured was accidentally stricken by a heart attack if a sole cause rule were adopted. As this Court understands their testimony, there is never a heart attack or myocardial infarction without

a prior arteriosclerotic condition. Can it be possible that a man who accidentally falls into a manhole and thereafter has a heart attack would not be covered?

In any event, as previously mentioned, the Iowa Supreme Court has not dealt with language comparable to that of the policy herein. There are generally two types of exculpatory clauses. See *Mahon,* supra. Typical of the first, are the words "directly and independently of all other causes." There are often variations of this clause by addition of words such as "wholly," "solely," "exclusively," "purely," or "only." This variety of clauses can be termed "limiting clauses." The second might be denominated the "exclusionary clause." It specifically excludes injuries caused wholly or partially, directly or indirectly, by disease, bodily infirmity, or particular maladies. Many courts apply the more stringent causation rule when an exclusionary clause is present in a policy. The Court in *Mahon* stated in 167 A.2d 191, 196–197:

"Although we have before us here for construction only a limited coverage clause, the absence of an exclusionary clause from the policy appears to us a vitally significant factor in the effort to arrive at a construction fairly according with the intent of the insurer in writing it and the reasonable expectations of the assured in buying it. Ambiguities in insurance contracts should be resolved, where reasonable to do so, strictly against the insurer. Hunt v. Hospital Service Plan of N[ew] J[ersey], 33 N.J. 98, 102–103, 162 A.2d 561, [81 A.L.R.2d 919] (1960); Yannuzzi v. U. S. Casualty Co., 19 N.J. 201, 207, 115 A.2d 557 (1955). In judging the existence of an ambiguity, and seeking clues to meaning, it is fair to look to the familiar and common recourses available to writers of insurance contracts for qualification of liability. For 70 years or more insurance carriers have sought to limit their liability on accident insurance primarily by means of the two general types of clauses indi-cated, or variants thereof. One type expressly and unmistakably excises from the coverage losses attributable directly or indirectly to bodily disease or infirmity. The other is equivocal as to any comparable effect or intent. This policy was issued in 1956. The availability of such common alternative usages, while not conclusive, is clearly a permissible aid to construction where only one of the alternatives is employed by the insurer."

Other courts have drawn the line upon which the causation rule is applicable within the limiting clause category itself instead of simply discerning whether or not an exclusionary clause is present. When "directly and independently of all other causes" is the language of the policy, the accident need merely be the proximate cause of the injuries. Bristol v. Mutual Benefit Health Ass'n, 305 Mich. 145, 9 N.W.2d 38. However, add such a term as "solely" and the sole cause rule comes into play. Scharmer v. Occidental Life Ins. Co., 349 Mich. 421, 84 N.W.2d 866.

The reasons for the distinctions adopted by the proponents of either line of authority are well-stated in *Mahon, Bristol,* and *Scharmer.* The Court in *Mahon* in 167 A.2d 191, 200, 201, persuasively reasons:

"* * * in addition to the factors mentioned above relevant to the intent of the insurer in drawing the contract, is what we deem the reasonable expectation of the average member of the public buying an accident policy. We think he pays premiums under the assumption that if he sustains an accident which directly subjects him to costly disability he will have indemnity therefor, and not be left empty-handed on the assertion by the company that his accidental injuries are worse than they would otherwise be because of the activation by the accident of a previous physical condition, especially one of which he was unaware and which had not affected him before the accident. It is cardinal in our law that in con-

structing an insurance policy there is a presumption that the insurer intended to have the insured understand that, in event of loss, he would be protected to the full extent that any fair interpretation would allow. Danek v. Hommer, 28 N.J.Super. 68, 76, 100 A. 2d 198 (App.Div.1953), affirmed 15 N. J. 573, 105 A.2d 677 (1954). * * *"

As stated by the New York Court of Appeals in a cognate situation, "* * * insurance policies upon which the public relies for security in case of an accident should be plainly written in understandable English 'free from fine distinctions which few can understand pointed out by lawyers and judges.' Burr v. Commercial Travelers Mut. Acc. Ass'n, 295 N.Y. 294, 67 N.E.2d 248, 252, 166 A.L.R. 462 (Ct.App.1946). And note the observation by the Judge Clark, dissenting in Bush v. Order of United Commercial Travelers, supra, 'insurance contract * * * may easily amount to traps for the uninitiated.' ([2 Cir.,] 124 F.2d, at p. [528,] 531) * * *."

The Court in *Bristol* relates in 9 N.W. 2d 38, 41:

"The important question in the case is whether the presence of a terminal disease at the time of the fatal accident bars recovery. In those instances where several causes concur to produce death, the answer depends upon the language of the policy. If the insuring clause is similar to that in the policy herein relied upon, and each claim can be supported by competent evidence, the decision of the jury is controlling. (Citations omitted) If the policy expressly excludes liability for death resulting directly or indirectly from bodily infirmity, illness, or disease, the accident itself must have been sufficient to cause death. (Citations omitted) Under the instant policy there would thus be recovery if death resulted from the head injury alone or in conjunction with other causes. Recovery under such a policy never depends upon the nature of the pre-existing disease, whether temporary or terminal. Other courts have gone so far as to impose liability even where a fatal disease concurred with only a slight injury on the ground that if the accident accelerated death, then death resulted independently of other causes. Hall v. General Accid. Assur. Corp., 16 Ga.App. 66, 85 S.E. 600; Fidelity & C[asualty] Co. v. Meyer, 106 Ark. 91, 152 S.W. 995, 44 L.R.A.,N.S. 493. We need not discuss the wisdom of this rule in view of the finding that the head injury caused the death. There is nothing in the policy disclaiming liability if the insured were suffering from a terminal disease and death would have ensued shortly after and independently of the accident. If the insurance company desired to exclude liability under such conditions, it could easily have done so by appropriate words. It saw fit to sell an attractive policy for a modest sum to people of limited education and without medical examination." See also *Scharmer*, supra.

Some courts adhere to a sole cause rule in all instances in which limiting clauses are in issue. It is very obvious that courts which appear to pass over such crucial distinctions have also placed a great deal of emphasis on the fact that words like "solely," "exclusively," "wholly," "only," or "purely" were included in the limiting clause.

In an opinion written by Augustus N. Hand, Circuit Judge, the Court in Bush v. Order of United Commercial Travelers of America, 124 F.2d 528 (2nd Cir.), cert. den., 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1765 (1942), the Court adopted the sole cause rule as to a policy insuring against "death due to accidental means alone and independent of all other causes." At p. 531 of 124 F.2d, the Court stated:

"While the line is often difficult to draw between congenital infirmity or weakness of old age and diseases accelerated by accidents, we think that such a dangerous and abnormal physical defect as the existence of a large

blood clot lodged in a vein leading to the heart brings the present case within the latter category and therefore that the death did not arise through 'accidental means alone.' "

At p. 530–531 of 124 F.2d, the Court related:

"It is argued that the Clark decision differs because the word 'indirectly' used in the policy there is broader than the words 'due to accidental means alone and independent of other causes.' We can see no practical difference and regard the Clark decision as directly in favor of the defendant's position."

■ Adkins v. American Casualty Co., 145 W.Va. 281, 114 S.E.2d 556, involved a policy insuring for accidental injury which was the sole cause of a loss. At pps. 560–561 of 114 S.E.2d, the Court said:

"There is, we think, a wide difference between the 'sole' cause of an injury and the 'sole proximate cause' of an injury. * * * Moreover, payment of monthly benefits are to be made payable only 'if injury shall * * * wholly and continuously disable.' The word 'wholly' leaves no room to read into the policy contributing causes, and 'sole cause' should not be enlarged or broadened from its ordinary plain meaning to include pre-existing diseases."

See also Dickerson v. Hartford Accident & Indemnity Co., 56 Ariz. 70, 105 P.2d 517. These decisions are not unreasonable when the reasons which militate in favor of the distinctions drawn are considered. Such words as "purely" or "solely" can hardly be said to be ambiguous. Such words more strongly indicate to the buyer that the existence and cooperation of pre-existing disease will preclude his recovery in case of an accident. He then has the prerogative of turning down the policy. The phrase "directly and independently of all other causes" is not such a signal of caution to the purchaser. This terminology is fairly susceptible to a meaning such as

was put forth in Browning v. Equitable Life Assur. Soc., 94 Utah 532, 72 P.2d 1060, rehear. den., 94 Utah 570, 80 P.2d 348. It was there said that this phrase does not mean uninfluenced or unaffected by other causes, but means uncontrolled by any other cause. The Iowa rule and the universal rule is that such clauses must be construed most strongly against the insurer and that any ambiguity will be resolved against it.

The Iowa Supreme Court has been impressed by the presence of exclusionary clauses. It has also attached great significance to strict wording in addition to or incorporated in the usual limiting clause. See cases supra and Berry v. United Commercial Travelers, 172 Iowa 429, 154 N.W. 598, L.R.A.1916B, 617.

■ From the foregoing analysis, this Court holds that its instruction was a correct statement of the law. Accordingly, defendant's contentions pertaining to the law of causation must fail.

We come then to the issue of whether the evidence was sufficient to allow jury deliberation. An exhaustive reiteration of the record is not necessary. Certain facts seem to be beyond any question. The Judge was a man given to sedentary habits. He was dedicated to the law and spent many hours working with legal texts. His leisure hours were primarily occupied by reading or watching television. His sons, James Jackson and William Jackson, took care of the household chores after they were big enough.

It is also well-established that no symptoms of heart trouble had ever been manifested prior to the time in question with the possible exception of nervous tension. Judge Jackson had taken therapeutical treatments to relieve tension for a few years before the fatal occurrence. But that fact did not establish any previous symptomatology of a heart condition or knowledge thereof. As previously discussed, this Court believes that the evidence of strain caused by Mr. Anderson's actions was sufficient, as against motions for judgment n. o. v. and for new trial, to permit the accident

issue to go to the jury upon the issue of whether the accidental strain caused Judge Jackson's death.

Dr. Anderson testified in behalf of plaintiffs. As part of a history obtained by Dr. Anderson at Judge Jackson's home, Dr. Anderson testified that Judge Jackson

"stated that he had been over to his father-in-law's, Herman F. Anderson, to assist in removing him from the washroom and briefly he said that the going was hard, but he did assist him into the den and at that time or soon or right then he experienced a severe sub-sternal, but I wrote down chest pain, and soon he went home."

Dr. Anderson pronounced that the medical cause of death was a myocardial infarction. That term means destruction or damage to heart tissue. In his opinion, the probable cause of the myocardial infarction "was the heavy lifting previous to the chest pain."

Dr. Chambers, who aided with the treatment of Judge Jackson until his demise on February 18, 1965, said that Judge Jackson had had a "posterior type myocardial infarction." In response to a hypothetical question encompassing activities of the Judge in the carrying process and the energy thereby expended. Dr. Chambers stated:

"Well, as a probable cause the coronary occlusion would be the most frequent event to follow the assumptions given, and the course of events described in this particular case, it would be my opinion that a coronary occlusion would be the leading possibility and possibly the only tenable one to make."

He described the course of events as "the strain, the subsequent pain and the shock that occurred. Dr. Chambers said that a myocardial infarction is "quite usually" the result of arteriosclerosis and that an infarction is the "common result of coronary arteriosclerosis. He had never seen a case in which the patient had not been afflicted with arteriosclerosis. However, he related that "the natural processes can occur at all times during life, but you can hurry them along by certain events." He testified that the proportionate relationship of strain to myocardial infarction is somewhere in the vicinity of 35%.

He stated that the pressure of arteriosclerosis "may explain the circumstances (of Judge Jackson's death). It doesn't explain the timing." And, "He had a severe strain and had died with the disease shortly after the strain." The excessive strain, in his opinion, was "a moving, probable cause precipitating a myocardial infarction upon a residual arteriosclerotic condition" and such strain was the "provocative cause."

Doctors Zoechler and Haines were defendant's expert witnesses. Dr. Zoechler said that in about ninety-eight out of every one hundred cases of myocardial infarction, the stricken person has arteriosclerosis. A heart attack without the presence of arteriosclerosis is "extremely unlikely" in Dr. Haines' estimation. Asked if a diagnosis of arteriosclerosis could be made after a myocardial infarction, he stated: "Yes, we assume it." Arteriosclerosis is a common condition. It narrows and hardens arteries and vessels by the depositing of certain substances in the intima or lining of the artery or vessel. If sufficiently narrowed, the passage of blood may be blocked or a blood clot may occur because the intima is no longer smooth. Arteriosclerosis may affect the coronary arteries. The end result of narrowing or clotting in the coronary arteries is a myocardial infarction.

According to Drs. Zoechler and Haines, arteriosclerosis is a progressive degenerative disease. Its rate of progress varies with the individual. Dr. Zoechler stated that "once the process has begun and symptoms develop, we can usually anticipate that sooner or later it will cause the patient's death." Both doctors agreed that the underlying process must be severe in order to produce death. It is not unusual for a patient to suffer a myocardial infarction without ever having manifested symptoms. Dr. Zoechler was of the opinion that

this was most likely to happen up to 50 years of age. The Judge was 59 when he died and Dr. Zoechler thought this was a borderline case. Dr. Haines thought a common era for symptoms of heart trouble to appear was in people of middle age.

Dr. Zoechler felt that Judge Jackson suffered his heart attack either from arteriosclerosis or arteriosclerosis in combination with extra exertion. He believed that arteriosclerosis was the major contributing cause. He said: "The amount of exertion that he underwent does not seem to me to be terribly severe, but we do know that exertion can sometimes initiate the symptoms of myocardial infarction if it is greatly outside of the normal band of exertion." He conceded that vulnerability to heart attack varies according to each individual's tolerance to physical exertion and inner condition and that he was not in a position to know how much the activity of Judge Jackson may have been outside his usual range. A demand can be made on the heart by physical exertion which the heart cannot cope with if the vessels are sufficiently narrowed by arteriosclerosis. He said most doctors thought of coronary artery disease in the light of the adage: "When the stage is set, the play will go on."

Dr. Haines said the predominant cause of Judge Jackson's death was arteriosclerosis. He said there seems to be no definite correlation of heart attacks to exertion. He said the modern trend in treatment for heart disease is to advise patients to exercise. He did feel, however, that there is a possible correlation. He stated that "we generally tell them not to use the lawn mower or shovel snow. I think this is common knowledge. This is what I usually do. They generally do it though." He thought heavy strain could have precipitated the heart attack.

Defendant's motion for judgment notwithstanding the verdict upon causation must be overruled. Plaintiffs' case is well supported by the record. It is very probable that the accident was not the sole cause of Judge Jackson's death but there is substantial evidence that it was the predominant or efficient cause. The evidence fairly shows that Judge Jackson was a man of sedentary disposition and that he was accidentally subjected to extraordinary strain.

Dr. Anderson, for plaintiffs, stated that the death was due to a myocardial infarction and that the probable cause was the heavy lifting. Dr. Chambers' opinion was that Judge Jackson probably had arteriosclerosis but that the "moving, probable cause" or the "precipitating cause" was the excessive strain.

Defendant's motion for a new trial is also overruled. The testimony of plaintiffs' expert witnesses fully supports the verdict which the jury returned. Dr. Zoechler said that the major contributing cause of Judge Jackson's death was the arteriosclerotic condition of his arteries, but he related that extraordinary physical strain can initiate the events leading to a myocardial infarction. Dr. Haines concluded that he could not correlate activity with heart attacks. However, he is adverse to overexertion on the part of his patients.

As the Supreme Court of Iowa emphasized in Watters, supra, in 69 N.W. 2d 1, 10, "It has been said that 'an ounce of fact is worth a pound of opinion.'" Judge Jackson was a scholar, not an athlete. He was confronted by tedious labor for which his body was unprepared. He suffered the cardiac failure immediately after the task was completed.

There is absolutely no merit in defendant's contentions that certain evidence was improperly admitted. Therefore, this Court concludes that the triers of fact have correctly resolved the issues in plaintiffs' favor in the case at hand.

Accordingly, it is hereby ordered that defendant's motion for judgment notwithstanding the verdict is overruled.

It is further ordered that defendant's motion for new trial is overruled.